OPINION
{¶ 1} Appellants, Susan and John McKinney ("the McKinneys"), appeal the decision of the Butler County Court of Common Pleas, Probate Division, in an adoption proceeding. The probate court found that the consent of both appellee, Linda Graham ("Graham"), and the Butler County Juvenile Court were required before the McKinneys could adopt Graham's two biological daughters. We affirm the probate court's decision that the adoptions cannot proceed. While the evidence shows that the probate court should not have required Graham's consent, the probate court did not err in requiring the juvenile court's consent.
 {¶ 2} In 1997, the Butler County Juvenile Court granted legal custody of Graham's two biological daughters, Christina Barkhurst ("Christina") and Kayleigh Lower ("Kayleigh"), both minors, to the McKinneys. Susan McKinney is Graham's sister. Christina was born on April 10, 1995, while Kayleigh was born on April 9, 1990. For reasons unclear in the record, Graham could no longer care for the children. The father of Christina is deceased and the father of Kayleigh is unknown. At the time the adoption petitions were filed, Graham was living in Florida with her husband and son.
 {¶ 3} Graham sporadically communicated with Christina and Kayleigh once the McKinneys were granted legal custody. In December 2000, Graham visited her daughters in Ohio. Shortly after this visit, Graham filed a motion with the Butler County Juvenile Court to regain custody of Christina and Kayleigh. Graham testified before the probate court that she did not know the McKinneys had obtained legal custody until she filed this motion. The record does not show that the juvenile court has ruled on Graham's motion. In August 2001, Graham again visited her daughters in Ohio.
 {¶ 4} The McKinneys filed petitions with the probate court to adopt Christina and Kayleigh on August 14, 2001. After a hearing on the matter, the probate court determined that Graham had failed to support the children in the year immediately preceding the filing of the adoption petitions. However, the probate court found that justifiable cause existed for Graham's failure to support. In support of this finding, the probate court mentioned Graham's insufficient income, the lack of a child support order, testimony that the McKinneys adequately provided for the children's needs, and testimony that the McKinneys expressed no interest in receiving financial assistance from Graham.
 {¶ 5} Thus, the probate court found that, because justifiable cause existed for Graham's failure to support Christina and Kayleigh, Graham's consent was required in order for the adoptions to proceed. The probate court also found that the consent of the Butler County Juvenile Court was required before the adoptions could proceed. Neither Graham nor the juvenile court consented to the adoptions. The juvenile court filed objections to the adoptions with the probate court.
 {¶ 6} The McKinneys now appeal the probate court's decision, assigning two errors.
 Assignment of Error No. 1 {¶ 7} "THE PROBATE COURT ERRED TO THE PREJUDICE OF APPELLANTS WHEN IT FOUND THAT THE CONSENT OF APPELLEE WAS REQUIRED."
 {¶ 8} Under this assignment of error, the McKinneys argue that the probate court erred when it determined that Graham had justifiable cause for her failure to support Christina and Kayleigh. We agree.
 {¶ 9} R.C. 3107.07 provides:
 {¶ 10} "Consent to adoption is not required of any of the following:
 {¶ 11} "(A) A parent of a minor, when it is alleged in the adoption petition and the court finds after proper service of notice and hearing, that the parent has failed without justifiable cause to communicate with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner."
 {¶ 12} The petitioner for adoption has the burden of proving, by clear and convincing evidence, that the natural parent has failed to support the child and that this failure was without justifiable cause.In re Adoption of Bovett (1987), 33 Ohio St.3d 102, 103. "Once the petitioner has established, by clear and convincing evidence, that the natural parent has failed to support the child for at least the requisite one-year period, the burden of going forward with the evidence shifts to the natural parent to show some facially justifiable cause for such failure. The burden of proof, however, remains with the petitioner." Id. at 104.
 {¶ 13} On appeal, we will not disturb a probate court's determination that consent is, or is not, necessary unless the court's determination is against the manifest weight of the evidence. Id. at paragraph four of the syllabus; In re Adoption of Masa (1986),23 Ohio St.3d 163, paragraph two of the syllabus. When the requisite degree of proof is clear and convincing, the evidence must be sufficient to "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 14} Graham, Susan McKinney, and John McKinney testified at the probate court hearing in January 2002. Ida Walkover, the sister of Graham and Susan McKinney, also testified.
 {¶ 15} Linda Graham testified that she was currently living with her husband and son in Florida. She testified that they had recently purchased a home in December 2000. Concerning her employment, she stated that she has worked as a cashier since November 2001. She testified that she worked 36-40 hours per week and made $8 per hour. From January 2000 until October 2001, she worked as a cashier for another employer, making $9 per hour. Her husband works as a truck driver and makes approximately $650 per week. Graham testified that she was at first unaware of the McKinneys' address, but has known their address since July 1998.
 {¶ 16} When asked why she never purchased clothing for the children or sent monetary support, Graham responded:
 {¶ 17} "Well I never really knew as far as money went. I was unsure because I knew Chrissy was getting social security and I was told by, I believe it was Chrissy's uncle, that there was a life insurance policy of money that was going towards Chrissy. And I really, I * * * was informed by other people who gave me advice that, you know, that unless I was able to see them or something to know that the money was going towards them, that I shouldn't, you know, whether or not I followed good advice or not, I don't know. Uh, as far as clothing went, [Susan McKinney] always made clothing and Kayleigh, when I'd ask her if she wanted some jeans, I asked her if I'd, you know, send her like a gift certificate for the GAP or something, she said she didn't know if you had one up here. That she didn't need any clothing, that she had plenty of clothes. Anytime, you know, I would ask her if she needed clothes and I heard Chrissy was a good size girl, so I had no idea what size she would be."
 {¶ 18} When asked why she did not directly ask the McKinneys what the children needed, Graham said: "I tried, but I'm a very bad talker. Uh, they never really wanted to talk to me." She continued: "If I, when I talked to [Susan McKinney] the few times that I did, and I asked her, you know, I want to know what you want from me, and I don't know what her exact response was, but it was something to, you know, I have to think about it. I just never really got very extended answers from her. It was always very short answers, as I said before, I really don't know [John McKinney]. I knew him as a kid, I think, but I really don't know him so I never thought to actually carry on a conversation with him."
 {¶ 19} Susan McKinney testified that though Graham had sent birthday cards and toys to the children in recent years, Graham never provided any monetary support. Mrs. McKinney testified that she and her husband never asked the juvenile court for a support order, though they were aware they could do so. According to Mrs. McKinney, she thought a support order would be ineffective, and that she "never thought about" asking Graham herself. She testified that she never told anyone that she did not want support from Graham, and that she would have accepted support if Graham had offered.
 {¶ 20} John McKinney testified that he and his wife have supported the children since they were granted legal custody in 1997. He testified that Christina received social security survivorship benefits through her deceased father, but that they have received no monetary support from Graham. He testified that he and his wife did not seek a support order, though the juvenile court judge had asked them if they wanted to do so. Mr. McKinney stated that he thought filing for a support order would be futile and that they "didn't want to create more trouble for [Graham]."
 {¶ 21} Mr. McKinney also testified to a December 2000 conversation with Graham in which he indicated that "it would be nice to have child support for [the] girls." However, according to Mr. McKinney, Graham stated that she was not making enough money to pay her own bills. We note that the probate court specifically did not find Mr. McKinney's testimony about this conversation to be credible.
 {¶ 22} Ida Walkover, the sister of Susan McKinney and Graham, testified that she cared for Kayleigh for six months before the McKinneys were granted legal custody in 1997. She testified that Mrs. McKinney once told her she did not want anything from Graham. She also testified that Mr. McKinney once told her that he did not want Graham to see the children again.
 {¶ 23} The probate court found that the McKinneys had proven, by clear and convincing evidence, that Graham had failed to support the children for at least one year immediately preceding the filing of the adoption petitions. However, the probate court found that the McKinneys had not proven, by clear and convincing evidence, that Graham's failure to support was without justifiable cause. The probate court supported this decision with three principal reasons: (1) the McKinneys did not show that Graham had the financial ability to pay support; (2) the McKinneys did not seek a court order from the juvenile court for support; (3) the McKinneys did not ask for or want support from Graham.
 {¶ 24} After reviewing the entire record, we find that the probate court's finding of justifiable cause is against the manifest weight of the evidence and contrary to law. First, the evidence in the record supports the conclusion that Graham had the financial means to provide at least some support for her daughters. The probate court found that Graham's income was "barely sufficient to pay her own bills." However, Graham's own testimony shows otherwise. Graham testified that, in the year immediately preceding the filing of the adoption petitions, she was working full-time as a cashier making $8 or $9 an hour. Her husband was also working full-time, making approximately $650 per week. Additionally, Graham and her husband purchased a house during the year immediately preceding the filing of the petitions. Based on this evidence in the record, Graham could have made at least "some minimal monetary contribution" to support her daughters. See In re Adoption ofTaylor (Mar. 22, 1993), Brown App. No. CA92-07-013.
 {¶ 25} In regard to the probate court's other reasons, the fact that the McKinneys did not seek a support order from the juvenile court and did not personally ask Graham for support does not justify Graham's failure to provide support. Graham had a statutory duty to support her minor children irrespective of the McKinneys' efforts to seek child support. R.C. 3103.03(A) provides: "The biological or adoptive parent of a minor child must support the parent's minor children out of the parent's property or by the parent's labor." The parental obligation to support is not excused by the temporary custody of the child being lodged with another. In re Adoption of Kuhlmann (1994), 99 Ohio App.3d 44, 50. Accordingly, included in the residual parental rights retained by Graham in this case is the "responsibility for support." R.C. 2151.011(B)(45).
 {¶ 26} Furthermore, the fact that the minor child is receiving social security benefits does not negate the duty of the natural parent to support that child. In re Adoption of Taylor, Brown App. No. CA92-07-013. The duty to support minor children is also not dependent on the natural parent's awareness of that duty. Kuhlmann,99 Ohio App.3d at 50.
 {¶ 27} We are aware of a line of cases from the Second Appellate District, the holdings of which are typified by the following passage:
 {¶ 28} "Where a child's needs are being adequately provided for by [custodial parents], who are in a better financial position than the natural parent, and the [custodial parents], being aware of the natural parent's financial circumstances, express no interest in receiving financial assistance from the natural parent, we conclude that the natural parent's failure to contribute towards the support of the child is not "without justifiable cause," for the purposes of R.C. 3107.07(A)." Matter of Adoption of Hadley (May 6, 1991), Greene App. No. 90CA117; see, also, In re LaValley (July 9, 1999), Montgomery App. No. 17710.
 {¶ 29} We do not find this line of cases persuasive or applicable to this case. It is not clear from the record that the McKinneys were in a better financial situation than Graham during the year immediately preceding the adoption filings. The record also does not clearly show that the McKinneys expressed no interest in receiving support from Graham. Regardless of what the record shows, we are of the opinion that the McKinneys' decision not to actively seek child support in no way "justifies" Graham's failure to support. Graham's statutory obligation to support her daughters exists irrespective of the McKinneys' efforts to obtain child support.
 {¶ 30} Based on the foregoing reasons, we find that the probate court's decision regarding justifiable cause is against the manifest weight of the evidence and contrary to law. Accordingly, we sustain the McKinneys' first assignment of error.
 Assignment of Error No. 2 {¶ 31} "THE PROBATE COURT ERRED TO THE PREJUDICE OF APPELLANTS WHEN IT FOUND THE CONSENT OF THE JUVENILE COURT WAS REQUIRED."
 {¶ 32} Under this assignment of error, the McKinneys contend that, in this case, R.C. 3107.06(D) does not require the juvenile court's consent to the adoptions. We disagree.
 {¶ 33} R.C. 3107.06 states in relevant part:
 {¶ 34} "Unless consent is not required under section 3107.07 of the Revised Code, a petition to adopt a minor may be granted only if written consent to the adoption has been executed by all of the following:
 {¶ 35} "* * *
 {¶ 36} "(D) The juvenile court that has jurisdiction to determine custody of the minor, if the legal guardian or custodian of the minor is not authorized by law or court order to consent to the adoption."
 {¶ 37} Original and exclusive jurisdiction over adoption proceedings is vested specifically in the probate court. State ex rel.Portage Cty. Welfare Dept. v. Summers (1974), 38 Ohio St.2d 144, paragraph two of the syllabus. R.C. 3107.06(D) should not be read as creating a jurisdictional bar over the probate court's authority to hear adoption petitions. State ex rel. Hitchcock v. Cuyahoga Cty. Court ofCommon Pleas, Probate Div. (1994), 97 Ohio App.3d 600, 604. The consent of the juvenile court is merely a statutory condition that must be met in some cases before an adoption can proceed. See Matter of Adoption ofTaylor (Feb. 3, 1987), Mahoning App. No. 86CA99.
 {¶ 38} The key question under this assignment of error is whether or not the McKinneys, as legal custodians of the children, were "authorized by law or court order to consent to the adoption[s]." If they were, the law does not require the consent of the juvenile court. If they were not, the law does require the consent of the juvenile court. We find that the McKinneys did not possess the legal authority to consent to the children's adoption. Therefore, the consent of the juvenile court was required by law before the adoptions could proceed.
 {¶ 39} Based on testimony in the record and the probate court's findings of fact, the McKinneys were granted "legal custody" of the children by Butler County Juvenile Court. R.C. 2151.011(B)(19) defines "legal custody" as "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." Not included in this definition is the right to consent to an adoption.
 {¶ 40} R.C. 2151.011(B)(45) defines "residual parental rights, privileges, and responsibilities" as "those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child, including, but not necessarily limited to, the privilege of reasonable visitation, consent to adoption, the privilege to determine the child's religious affiliation, and the responsibility for support." (Emphasis added.)
 {¶ 41} In contrast to legal custody, the Ohio Revised Code defines "permanent custody" as "a legal status that vests in a public services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, and divests the natural parents or adoptive parents of all parental rights, privileges, and obligations, including all residual rights and obligations." (Emphasis added.) R.C. 2151.011(B)(30).
 {¶ 42} These statutory definitions, read together, indicate that the McKinneys did not gain the power to consent to the children's adoption when the Butler County Juvenile Court granted them "legal custody" of the children in 1997. The power to consent to the children's adoption was not granted to the McKinneys, but rather, was retained by Graham, the children's biological mother, as a residual right. Thus, these statutory definitions indicate that the McKinneys were not "authorized by law" to consent to the children's adoption.
 {¶ 43} The McKinneys claim in their brief that R.C. 3107.07(F) grants them legal authority to consent to the children's adoption. However, R.C. 3107.07(F) does not describe the circumstances under which a legal guardian has the legal authority to consent to an adoption. Rather, R.C. 3107.07(F) describes the circumstances under which consent of a legal custodian is not required. That section states that consent is not required of a legal custodian who has failed to timely respond to a request for consent. See R.C. 3107.07(F). The McKinneys essentially argue that because their consent was timely given, they were "authorized by law" to give their consent. We disagree. R.C. 3107.07(F) does not state who is or is not authorized by law to consent to an adoption, but merely states when consent of a legal custodian is not required.
 {¶ 44} Thus, we find no source of law and no court order in the record granting the McKinneys, as legal custodians, the power to consent to the children's adoption. Therefore, because the McKinneys were not "authorized by law or court order to consent to the adoption[s]," the juvenile court's consent was required before the adoptions could proceed. R.C. 3107.06(D). Accordingly, we overrule the McKinneys' second assignment of error.
 {¶ 45} Thus, we affirm the probate court's decision that the adoptions cannot proceed. Though the adoptions could proceed without the consent of Graham, the adoptions could not proceed without the consent of the juvenile court.
 {¶ 46} Judgment affirmed.
WALSH, P.J., and VALEN, J., concur.